No. 102,473

In The Matter of JAMES A. CLINE, *Respondent.*

(217 P.3d 455)

*Opinion filed October 9, 2009.*

*Stanton A. Hazlett*, disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio Chtd., of Topeka, argued the cause, and *James A. Cline*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against James A. Cline, of Wichita, an attorney admitted to the practice of law in Kansas in 1990.

On January 14, 2009, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). On January 23, 2009, the respondent filed an answer to the formal complaint and a proposed probation and supervision plan. On March 2, 2009, the Disciplinary Administrator and the respondent, represented by counsel, entered into a joint stipulation regarding the rule violations. A hearing was held before a panel of the Kansas Board for Discipline of Attorneys, where the respondent appeared in person and was represented by counsel. The hearing panel determined that the respondent violated KRPC 1.1 (2008 Kan. Ct. R. Annot. 400) (competence), KRPC 1.2 (2006 Kan. Ct. R. Annot. 367) (scope of representation), KRPC 1.3 (2008 Kan. Ct. R. Annot. 415) (diligence), KRPC 1.4(a) (2008 Kan. Ct. R. Annot. 432) (communication), KRPC 1.8(e) (2008 Kan. Ct. R. Annot. 469) (providing financial assistance to client), KRPC 1.8(h)(2) (settling potential claim), KRPC 1.16(d) (2008 Kan. Ct. R. Annot. 508) (terminating representation), KRPC 5.3 (2008 Kan. Ct. R. Annot. 561) (responsibilities regarding nonlawyer assistants), KRPC 8.3(a) (2008 Kan. Ct. R. Annot. 585) (reporting professional misconduct), and KRPC 8.4(c) (2008 Kan. Ct. R. Annot. 586) (conduct involving dishonesty,

fraud, deceit, or misrepresentation). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

## "FINDINGS OF FACT

. . . .

"2. During the relevant time periods, the Respondent was employed as a lawyer in the law firm, the Accident Recovery Team, P.A., in Wichita, Kansas. Jeff T. Tevis is the sole proprietor of the firm and the Respondent was an employee of the firm.

### "*Representation of Richard Stephens*

"3. On February 11, 2005, Richard Stephens underwent a liver biopsy at St. Francis Hospital in Wichita, Kansas. Although the surgery was supposed to be routine, there were adverse consequences of surgery. During the four months that followed the surgery, Mr. Stephens spent 51 days in the hospital and incurred medical bills in an amount close to $2,000,000.00. Mr. Stephens believed that his problems resulted from medical malpractice.

"4. On March 2, 2005, the Respondent met with Mr. Stephens at Mr. Stephen's home. The Respondent agreed to represent Mr. Stephens in the medical malpractice case. The Respondent told Mr. Stephens that there was a two year statute of limitations. At that time, Mr. Stephens signed a fee agreement, titled 'Personal Injury Agreement.' However, the Respondent neither signed nor dated the agreement.

"5. After Mr. Stephens retained the Respondent, the Respondent misplaced Mr. Stephens' file. Because the file had been misplaced, the firm's paralegals did not docket and calendar dates and obtain medical records.

"6. On May 17, 2005, Debbie, Mr. Stephens' girlfriend, left some of Mr. Stephens' medical bills at the firm for the Respondent.

"7. During the two years after Mr. Stephens retained the Respondent, Mr. Stephens called the Respondent on 26 separate occasions. The Respondent returned very few of these telephone calls. The Respondent did not properly communicate with Mr. Stephens.

"8. Also, during the two years after Mr. Stephens retained the Respondent, the Respondent met with Mr. Stephens in his home on approximately five occasions. During one of the meetings at Mr. Stephens' home, the Respondent told Mr. Stephens that the case was 'in the system.' However, the Respondent had not filed the suit and the case was not 'in the system.'

"9. During the course of the representation, Mr. Stephens made a number of requests for copies of documents showing what was going on in the case. The Respondent did not provide the documentation requested.

"10. The Respondent falsely told Mr. Stephens that the case was 'filed' or 'set for court.' The Respondent falsely told Mr. Stephens that he filed suit in his behalf against the St. Francis Hospital. Later, the Respondent falsely told Mr. Stephens

'don't worry, we'll take care of you,' 'you're good,' 'we're going to do the screening panel,' and 'you're okay.'

"11. In February, 2007, the statute of limitations expired. The Respondent failed to preserve Mr. Stephens' claim by filing suit.

"12. In March, 2007, the Respondent met with Mr. Stephens regarding settlement of the case. At that time, Mr. Stephens was in financial straits. Mr. Stephens told the Respondent that he wanted $40,000.00 free of any liens to settle the case.

"13. On two separate occasions, the Respondent gave money to Mr. Stephens, in the amounts of $250.00 and $350.00, because Mr. Stephens needed money.

"14. In May, 2007, the Respondent went to Mr. Stephen's house and falsely told Mr. Stephens that St. Francis wanted to settle the case for $32,000.00. Mr. Stephens rejected this offer. The Respondent assured Mr. Stephens that he would try to get another offer. By this time, the Respondent knew that he had missed the statute of limitations.

"15. In May or June, 2007, Mr. Stephens began to distrust the Respondent. Mr. Stephens contacted Travis Burk, an attorney in Wichita, Kansas. Mr. Burk and his partner, Gary Patterson, came to Mr. Stephens' home. Mr. Burk and Mr. Patterson told Mr. Stephens that there was the potential for a lawsuit against the Respondent arising out of the Respondent's representation of Mr. Stephens in the medical malpractice case.

"16. In early July, 2007, Mr. Burk called the Respondent regarding Mr. Stephens' case. The Respondent falsely assured Mr. Burk that he had filed the case and was in the process of negotiating a settlement with defense counsel. The Respondent also falsely told Mr. Burk that a request for a screening panel had been filed.

"17. On July 10, 2007, Mr. Burk sent a letter to Mr. Stephens relating what the Respondent had told Mr. Burk. Mr. Burk sent a copy of the letter to the Respondent.

"18. On July 20, 2007, the Respondent again went to Mr. Stephens' home. The Respondent told Mr. Stephens that he had lied to him and that he had not filed a lawsuit in his behalf against St. Francis. The Respondent asked Mr. Stephens not to talk to anyone at the Accident Recovery Team about the case.

"19. On July 22, 2007, Mr. Stephens and his father, James G. Stephens, went to the Respondent's office and met with the Respondent. At that meeting, the Respondent told Mr. Stephens and Mr. Stephens' father that he had missed the statute of limitations. The Respondent asked Mr. Stephens' father what it would take to 'fix the problem.'

"20. James G. Stephens told the Respondent that if Mr. Stephens received $100,000.00 that they would not hire another attorney to pursue a claim against the Respondent. The Respondent agreed to pay Mr. Stephens $100,000.00.

"21. On July 23, 2007, Mr. Stephens and his father again went to the Respondent's office. The Respondent presented Mr. Stephens and his father with a release and settlement agreement. The Respondent did not advise Mr. Stephens

in writing of the desirability of seeking counsel and give him a reasonable opportunity to seek the advice of independent counsel regarding the release and settlement agreement. Additionally, according to Mr. Stephens, he was on medication that day and could not read the agreement. The release and settlement agreement was signed by Mr. Stephens, his father, and the Respondent. That day, the Respondent gave Mr. Stephens a $30,000.00 cashier's check. Thereafter, on August 6, 2007, the Respondent paid Mr. Stephens an additional $69,400.00, as the Respondent had previously paid Mr. Stephens $600.00.

"22. The release and settlement agreement, drafted by the Respondent, contains the following language, which includes a false statement.

'I have consulted with an independent attorney who has no working relationship with the Accident Recovery Team, P.A., Jeff T. Tevis or James A. Cline. Travis Burk, Attorney at Law, has spoken with me at length about all these matters. After speaking with Mr. Burk, I have elected to sign this agreement with full knowledge of the consequences and ramifications. I feel this agreement is in my best interests and all matters between myself and the Accident Recovery Team, P.A., Jeff T. Tevis, James A. Cline, R. Todd King, Sean C. Brennan or Gary K. Albin are hereby resolved and no further actions will be taken on my part.'

Mr. Stephens had not spoken to Mr. Burk regarding the release and settlement agreement.

"23. The release and settlement agreement requires that the agreement remain confidential and contains a bar and release of all claims which are defined to include, among other things, 'complaints and grievances.'

"24. On November 28, 2007, Mr. Patterson sent a letter to Mr. Tevis advising him that Mr. Patterson believed that the Respondent had violated the Kansas Rules of Professional Conduct and had a duty to report the misconduct to the Disciplinary Administrator's office. Mr. Patterson advised Mr. Tevis that if the Respondent did not self-report the misconduct, Mr. Patterson would file a complaint. Neither the Respondent nor Mr. Tevis reported the misconduct to the Disciplinary Administrator's office.

"25. On January 22, 2008, Mr. Patterson filed a complaint against the Respondent with the Disciplinary Administrator's office.

"26. On March 3, 2008, the Respondent provided a written response to Mr. Patterson's initial complaint. The Respondent included a copy of the release and settlement agreement signed by Mr. Stephens, his father, and the Respondent. The Respondent falsely stated the following in his letter to the attorney assigned to investigate Mr. Patterson's complaint.

'As you can see, Mr. Stephens consulted with an attorney regarding this matter. In order to ensure he had adequate representation, I also requested that his father, a retired businessman, also participate in the discussions.'

The Respondent knew that Mr. Stephens had not consulted with an attorney regarding the release and settlement agreement.

## "Representation of Frank Garcia

"27.  On January 3, 2001, Frank Garcia experienced chest pains. He went to the Garden City Medical Clinic on that date, was treated primarily by a nurse, and was sent home. The next day, at work, he suffered a heart attack and died. He was survived by his wife and children.

"28.  On January 23, 2001, the Garcias contact[ed] the Accident Recovery Team and spoke with Jeff Tevis. Mr. Tevis completed an intake sheet for the worker's compensation matter and assigned the Respondent as the primary lawyer on the case.

"29.  Frank Garcia, Jr., Special Administrator of his father's estate, believed that the Respondent agreed to handle the medical malpractice case, as well as the worker's compensation case.

"30.  On January 25, 2001, Mr. Tevis gave the Respondent a handwritten note asking to whom the firm should refer the medical malpractice case. On that note, the Respondent wrote the names, 'Andy Hutton, Mark Hutton and Brad Prochaska.'

"31.  The Respondent instructed his paralegal to draft a letter to the Garcias telling them that the Accident Recovery Team did not handle malpractice cases and suggesting that they contact Andy Hutton, Mark Hutton, or Brad Prochaska. The Respondent did not mention the statute of limitations in the letter.

"32.  While the Respondent believes that the letter was sent, Frank Garcia, Jr. indicated that he never received the letter.

"33.  The Respondent told the investigator that he believed that he told Frank Garcia, Jr., that he was not going to handle the medical malpractice case. Frank Garcia, Jr., indicated that the Respondent never told him that he would not handle the medical malpractice case. Frank Garcia, Jr. believed that the Respondent and his firm were handling the medical malpractice case.

"34.  The Accident Recovery Team and the Respondent had paralegals collect medical documents for the Garcia representation, but did little else. The Garcia children called numerous times, but few calls were returned.

"35.  On November 5, 2002, Peggy Keene, a paralegal in the office, took a message from Ed Garcia. The message read, 'Wants to know who you referred case to!' Neither the Respondent nor anyone else in the firm returned the phone call.

"36.  The phone records show that neither the Respondent nor anyone else in the firm was in contact with the Garcias in November, 2002, December, 2002, or January, 2003. The records show that only three telephone calls were returned to the Garcias from January, 2001, until January, 2003.

"37.  On January 4, 2003, the statute of limitations to file the medical malpractice suit expired. Neither the Respondent nor anyone else filed suit in behalf of the Garcias prior to the expiration of the statute of limitations.

"38.  Jerry Levy filed a legal malpractice suit against the Respondent regarding his representation of the Garcias. Eventually, the Respondent's malpractice carrier settled the Garcias' claim for $100,000.00.

*"Representation of Carey Irvin*

"39.   Carey Irvin had a spinal operation for a herniated disc on August 12, 2003. The procedure was performed at the South Central Kansas Regional Medical Center (hereinafter 'SCKRMC') and involved several doctors.

"40.   After the operation, he experienced problems with pain and was readmitted to the hospital on August 27, 2003. Mr. Irvin died on August 28, 2003, as a result of septicemia and an infected spinal surgery wound.

"41.   On May 5, 2005, the Respondent met with Shirley Goulden, Mr. Irvin's representative. Ms. Goulden retained the Respondent to represent Mr. Irvin's estate in a medical malpractice case. During the May 5, 2005, meeting, the Respondent completed a medical malpractice questionnaire.

"42.   Following May 5, 2005, the Respondent and the Accident Recovery Team conducted little or no investigation other than to collect a few medical records.

"43.   On August 25, 2005, two days before the statute of limitations expired, the Respondent filed suit against SCKRMC and the Ark City Clinic, P.A. The Respondent did not name any doctors in the suit because he had reached the conclusion that the doctors had not committed malpractice. The Respondent did not discuss his decision to not name any doctors in the suit with Ms. Goulden.

"44.   The Respondent learned that SCKRMC was owned by the City of Arkansas City and that notice, pursuant to K.S.A. 12-105(b) was required. On August 26, 2005, the Respondent sent the required statutory notice. However, SCKRMC did not receive the statutory notice until August 29, 2005, after the expiration of the statute of limitations.

"45.   K.S.A. 40-3403(h) and K.S.A. 65-442 limit the vicarious liability of a hospital for the actions of any other health care provider. The Respondent's failure to name the physicians as defendants in the lawsuit precluded any cause of action against the physicians directly and against the hospital *via* vicarious liability.

"46.   Without consulting Ms. Goulden, on March 21, 2006, the Respondent dismissed the suit without prejudice. On May 3, 2006, the Respondent finally notified Ms. Goulden that he had dismissed the suit. The Respondent advised Ms. Goulden that she had six months, under the savings statute, to refile the case. The Respondent informed Ms. Goulden that he was withdrawing from the representation because it was not 'economically feasible to pursue' the case.

"47.   During the year that the Respondent represented Mr. Irvin's estate, the Respondent failed to locate an expert witness or engage in any discovery.

"48.   Mr. Levy also filed a legal malpractice case against the Respondent in relation to the Respondent's representation of Mr. Irvin's estate. On October 2, 2007, the legal malpractice case was settled and the Respondent's malpractice carrier agreed to pay $60,000.00 to Mr. Irvin's estate.

*"Representation of Herman Ternes*

"49.   On March 5, 2004, Herman Ternes underwent heart surgery by Joseph Galichia at the Galichia Heart Hospital (hereinafter "GHH"). During Mr. Ternes'

surgery, while Dr. Galichia was inserting a stint, an artery was torn. Additionally Mr. Ternes also had possible kidney injuries due to surgery dye.

"50.    On February 9, 2005, Mr. Ternes contacted the Accident Recovery Team and met with the Respondent. The Respondent completed a medical malpractice questionnaire with Mr. Ternes.

"51.    Thereafter, Mr. Ternes had difficulty in obtaining medical records from GHH. An employee at GHH told the Respondent that Mr. Ternes' records were lost.

"52.    Later, the Respondent attempted to refer Mr. Ternes' case to Mr. Prochaska. However, Mr. Prochaska declined to accept the representation.

"53.    On March 4, 2006, one day before the expiration of the statute of limitations, the Respondent filed suit in behalf of Mr. Ternes against Dr. Galichia and the Galichia Medical Group, P.A. However, the Respondent delegated the responsibility of obtaining service on Dr. Galichia to a paralegal. The paralegal failed to achieve proper service on Dr. Galichia.

"54.    In late 2007, Mr. Tevis ordered the Respondent to get rid of all his medical malpractice cases. The Respondent met with Mr. Ternes and told him he would no longer handle the medical malpractice case.

"55.    On January 2, 2007, the Respondent filed a journal entry of dismissal without prejudice.

"56.    During the time the Respondent represented Mr. Ternes, he failed to obtain an expert witness or engage in any discovery.

"57.    Mr. Levy has filed a legal malpractice case against the Respondent regarding his representation of Mr. Ternes. Mr. Levy is also pursuing the medical malpractice case. The suits remain pending.

"CONCLUSIONS OF LAW

"1.    Prior to the hearing on the Formal Complaint, the Disciplinary Administrator, the Respondent, and counsel for the Respondent entered into a Stipulation regarding the rule violations in this case. The Respondent stipulated that he violated KRPC 1.1, KRPC 1.2, KRPC 1.3, KRPC 1.4, KRPC 1.8, KRPC 1.16, KRPC 5.3, and KRPC 8.3, and KRPC 8.4. Accordingly, based on the Respondent's stipulation and the evidence presented to the Hearing Panel, the Hearing Panel concludes that clear and convincing evidence exists that the Respondent violated KRPC 1.1, KRPC 1.2, KRPC 1.3, KRPC 1.4, KRPC 1.8, KRPC 1.16, KRPC 5.3, KRPC 8.3, and KRPC 8.4, as detailed below.

"2.    Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The Respondent violated KRPC 1.1 in a number of ways. First, the Respondent violated KRPC 1.1 when he failed to advise Frank Garcia, Jr. of the applicable statute of limitations in the personal injury case. Next, the Respondent failed to provide competent representation to Mr. Irvin's estate when he failed to name the doctors involved in the treatment of Mr. Irvin as defendants in the law suit. Further, the

Respondent violated KRPC 1.1 when he failed to obtain an expert witness or engage in any discovery during the time he represented the estate of Mr. Irvin and when he represented Mr. Ternes. Finally, the Respondent failed to competently represent Mr. Irvin's estate when he conducted little or no investigation into the medical malpractice claim. Accordingly, the Hearing Panel concludes that the Respondent repeatedly violated KRPC 1.1.

"3.   KRPC 1.2 [2006 Kan. Ct. R. Annot. 367] provides:

'(a)   A lawyer shall abide by a client's decisions concerning the lawful objectives of representation, subject to paragraphs (c), (d), and (e), and shall consult with the client as to the means which the lawyer shall choose to pursue. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.

. . . .

'(c)   A lawyer may limit the objectives of the representation if the client consents after consultation.'

The Respondent failed to act properly within the scope of his representation when he failed to name the doctors involved in the treatment of Mr. Irvin as defendants without first discussing this with Ms. Goulden, the representative of Mr. Irvin's estate. Additionally, the Respondent violated KRPC 1.2 when he dismissed the Irvin law suit without prejudice without consulting with Ms. Goulden. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.2.

"4.   Attorneys must act with reasonable diligence and promptness in representing their clients. See KRPC 1.3. The Respondent failed to diligently and promptly represent his client in the Irvin case. Specifically, the Respondent waited until two days before the statute of limitations expired on the Irvin claim to file suit against the South Central Regional Medical Center. Additionally, the Respondent never properly obtained service upon Joseph Galichia. Because the Respondent failed to act with reasonable diligence and promptness in representing his client(s), the Hearing Panel concludes that the Respondent violated KRPC 1.3.

"5.   KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the Respondent violated KRPC 1.4(a) when he failed to properly communicate with Mr. Stephens and the Garcias. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.4(a).

"6.   Lawyers are prohibited from engaging in certain conduct with regard to current clients. KRPC 1.8 sets forth specific activities that a lawyer may not engage in with current clients. The Respondent violated two separate provisions of KRPC 1.8, subsection (e) and subsection (h)(2).

"7.   KRPC 1.8(e) provides:

'(e)   A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:

(1)   a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

(2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.'

The Respondent violated KRPC 1.8 when he provided financial assistance to Mr. Stephens in connection with the litigation on at least two occasions. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.8(e).

"8. KRPC 1.8(h)(2) prohibits attorneys from settling a potential claim for liability unless 'that person is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel in connection therewith.' Here, the Respondent settled a claim regarding his liability with Mr. Stephens who was not represented by counsel without first advising Mr. Stephens in writing of the desirability of seeking counsel and without first giving Mr. Stephens a reasonable opportunity to seek the advice of independent counsel. Therefore, the Hearing Panel concludes that the Respondent violated KRPC 1.8(h)(2).

"9. KRPC 1.16 requires lawyers to take certain steps to protect clients after the representation has been terminated. Specifically, KRPC 1.16(d) provides:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

The Respondent violated KRPC 1.16(d) when he failed to preserve the suit filed in behalf of Mr. Irvin's estate and when he dismissed Mr. Ternes' case without properly protecting Mr. Ternes' interests. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.16(d).

"10. Lawyers must supervise their nonlawyer assistants. *See* KRPC 5.3. In this case the Respondent failed to do so by failing to make reasonable efforts to ensure that the paralegals competently and timely handled Mr. Stephens' medical malpractice case. Additionally, the Respondent failed to properly supervise the non-lawyer assistants in his office with respect to a paralegal's attempts to obtain proper service in Mr. Ternes' suit. As such, the Hearing Panel concludes that the Respondent violated KRPC 5.3.

"11. KRPC 8.3(a) provides that '[a] lawyer having knowledge of any action, inaction, or conduct which in his or her opinion constitutes misconduct of an attorney under these rules shall inform the appropriate professional authority.' In this case, the Respondent knew that he had repeatedly violated the Kansas Rules of Professional Conduct in his representation of Mr. Stephens. Mr. Patterson and Mr. Burk directed correspondence to the Respondent's supervisor, Mr. Tevis, which provided Mr. Tevis and the Respondent an opportunity to report the misconduct. Mr. Tevis and the Respondent ignored Mr. Patterson and Mr. Burk's letter. Because the Respondent failed to self-report his conduct, the Hearing Panel concludes that the Respondent violated KRPC 8.3(a).

"12. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in a pattern of dishonest conduct when he repeatedly provided false information to Mr. Stephens regarding the status of the representation. Additionally, the Respondent engaged in dishonest conduct when he told Mr. Burk that a medical malpractice case had been filed, that the Respondent was negotiating a settlement with defense counsel, and that a screening panel had been filed. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to his clients to provide competent and diligent representation and adequate communication. The Respondent violated his duty to the public to maintain his personal integrity.

"*Mental State.* The Respondent knowingly violated his duties.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual serious injury to his clients.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Prior Disciplinary Offenses.* On April 1, 2008, the Respondent entered into the Attorney Diversion Program. In the agreement, the Respondent acknowledged that he violated KRPC 1.2, KRPC 1.7, and KRPC 1.16. The Respondent successfully completed the terms and conditions of the agreement and the case was dismissed. Pursuant to Kan. Sup. Ct. R. 203(d), prior participation in the Attorney Diversion Program constitutes prior discipline.

"*Dishonest or Selfish Motive.* The Respondent's misconduct regarding Mr. Stephens was motivated by dishonesty. The Respondent's misconduct associated with Mr. Stephens is quite serious.

"*A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct. Four clients were injured by the Respondent's misconduct. Additionally, the misconduct detailed in the diversion agreement is of similar nature.

"*Multiple Offenses.* The Respondent violated KRPC 1.1, KRPC 1.2, KRPC 1.3, KRPC 1.4, KRPC 1.8, KRPC 1.16, KRPC 5.3, KRPC 8.3, and KRPC 8.4. As such, the Hearing Panel concludes that the Respondent's misconduct constitutes multiple offenses.

"*Substantial Experience in the Practice of Law.* The Respondent was admitted to the practice of law on September 20, 1990. At the time the Respondent's misconduct began, he had been practicing law for approximately 15 years. The Respondent has substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The Respondent fully cooperated in the investigation and prosecution of the disciplinary case. The Respondent fully acknowledged his transgressions.

'*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent is an active and productive member of the Wichita, Kansas, bar. He enjoys the respect of his peers, clients, and community members as detailed in Respondent's Exhibit A.

'*Remorse.* At the hearing on this matter, the Respondent expressed genuine remorse.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.42    Suspension is generally appropriate when:

(a)    a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b)    a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'4.52    Suspension is generally appropriate when a lawyer engages in an area of practice in which the lawyer knows he or she is not competent, and causes injury or potential injury to a client.

'4.62    Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.'

## "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be suspended from the practice of law for a period of one year. Additionally, the Disciplinary Administrator recommended that the Respondent be required to undergo a hearing pursuant to Kan. Sup. Ct. R. 219 prior to reinstatement. The Respondent recommended that his plan of probation be adopted and that he be allowed to continue to practice law.

"Kan. Sup. Ct. R. 211(g) governs when a Hearing Panel should recommend that a Respondent be placed on probation. That rule provides:

'(1)    If the Respondent intends to request that the Respondent be placed on probation for violating the Kansas Rules of Professional Conduct or the

Kansas Supreme Court Rules, the Respondent shall provide each member of the Hearing Panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least ten days prior to the hearing on the Formal Complaint. The plan of probation must contain adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court.

'(2) If the Respondent provides each member of the Hearing Panel and the Disciplinary Administrator with a plan of probation, the Respondent shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan.

'(3) The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i) the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least ten days prior to the hearing on the Formal Complaint;

(ii) the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii) the misconduct can be corrected by probation; and

(iv) placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

"While the Respondent has satisfied many of the requirements of Kan. Sup. Ct. R. 211(g)(3), the Respondent has failed to satisfy two of the requirements. Specifically, the misconduct that the Respondent engaged in cannot be corrected by probation. The Respondent engaged in dishonest misconduct. Engaging in dishonest conduct is a character trait and cannot be monitored by a [supervising attorney]. Further, based on the serious nature of the Respondent's misconduct, placing the Respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas. Accordingly, the Hearing Panel rejects the Respondent's request for probation.

"Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended from the practice of law for a period of one year. In the opinion of the Hearing Panel, a reinstatement hearing, pursuant to Kan. Sup. Ct. R. 219, is not warranted in this case.

"Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

In a footnote, the hearing panel also made the following observation:

"The Hearing Panel recognizes that the Respondent suffers from depression. However, the evidence presented in this case falls short of establishing that the Respondent's misconduct was, in anyway, caused by his depression. The Hearing Panel accepts that depression may have prevented the Respondent from timely

handling his business, but the testimony that depression caused the Respondent to lie to his clients and otherwise mislead them is not believable. The Respondent's expert admitted that the contention has no support in the standard publication governing mental disorder diagnosis. Accordingly, the Hearing Panel concludes that the Respondent's depression is not a mitigating factor."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]); see Supreme Court Rule 211(f) (2008 Kan. Ct. R. Annot. 313).

The respondent filed no exception to the panel's final hearing report but reserved his right to argue in mitigation of the recommended discipline before this court. Thus, the hearing panel's final report is deemed admitted. Supreme Court Rule 212(c) (2008 Kan. Ct. R. Annot. 327). We have reviewed the entire record including the transcript of proceedings before the panel. We conclude the panel's findings of fact are supported by clear and convincing evidence and support the panel's conclusions of law. We therefore adopt those findings and conclusions. With respect to the discipline to be imposed, the panel's recommendation that the respondent be suspended from the practice of law in Kansas for a period of 1 year subject to recommended conditions is advisory only and shall not prevent the court from imposing a different discipline. Supreme Court Rule 212(f).

Before oral argument, the respondent submitted additional information to the court, including an affidavit from the respondent; a letter from his treating physician regarding his treatment for depression; a letter from his treating therapist, J.D. Moorehead, LSCSW; a letter from David L. Hiebert representing the Wichita Bar Association Lawyers Assistance Committee; and testimony from Mel Gregory of Render Kamas, L.C., the attorney monitoring the respondent's practice of law consistent with the plan of probation submitted by the respondent prior to the panel hearing.

During oral argument the respondent and his counsel did not seek to avoid responsibility for the admitted violations of the Supreme Court Rules for attorney discipline. Instead, the respondent concentrated his oral argument on the additional evidence submitted relating to the respondent's clinical depression, his treatment for depression, statements from treating physicians, and letters of support from the Wichita Bar Association Lawyers Assistance Committee and members of the bar supporting the respondent in his request to continue in the practice of law in Kansas subject to his submitted probation plan, which the respondent has successfully followed since before his panel hearing.

We note that the panel acknowledged that the respondent was suffering from depression but concluded that the respondent's misconduct was not in any way caused by his depression. Thus, the panel concluded that the respondent's depression was not a mitigating factor. The respondent's counsel during oral argument contended that while the respondent's depression may not have directly caused his dishonest misconduct, the respondent's depression indirectly contributed to this misconduct.

The respondent's argument before this court acknowledged his wrongdoing, and he gave sincere apologies for the harm caused to the court, the profession, and his family. The respondent persuasively argued that he has addressed the problems causing his misconduct and that he continues to practice law under a strict plan of attorney-monitored probation without incident. Thus, according to the respondent's argument, allowing him to continue in the practice of law in this state presents no danger to the public or his clients, who are served by a capable and competent attorney, insuring adequate representation.

Absent from the discussion during oral argument, however, was the actual nature of the violations occurring in this case. When responding to the question of how to balance the good of the respondent with the actual harm caused by the respondent's misconduct, the respondent responded by again focusing on the ongoing efforts to continue with his rehabilitation, recognizing that all of his clients are now being capably served.

In reviewing the respondent's actions, we note that he accepted a potential malpractice action on behalf of Stephens, failed to communicate with his client during that representation, falsely told his client that his case had been filed, and attempted to settle the case with the client by falsely representing that a $32,000 offer of settlement had been made.

Once this offer was rejected the respondent again lied to an attorney making inquiries on behalf of his client that a malpractice action had been filed, negotiations for settlement were underway and that the respondent had requested a screening panel. The respondent failed to take any action to toll the statute of limitations. He finally admitted to his client that he failed to file suit in time and offered his client $100,000 to settle his malpractice. His client accepted, and this amount has been paid. In the settlement agreement, the respondent falsely represented that his client sought and obtained independent legal advice.

The respondent again lied in a letter to the investigator appointed by the Disciplinary Administer, stating: "As you can see, Mr. Stephens consulted with an attorney regarding this matter [settlement]. In order to ensure he had adequate representation, I also requested that his father, a retired businessman, also participate in the discussions."

Garcia, Irvin, and Ternes similarly lost any opportunity to have their cases handled by competent counsel in the manner provided for in our civil justice system. With the aid of another attorney, some recovery through the respondent's malpractice insurance has been obtained for Garcia and Irvin. Recovery may also be obtained through the same means for Ternes. With all the cases mishandled by the respondent, it is difficult to determine what may have resulted if those clients would have received adequate representation or to what extent those clients would have been compensated for their injuries.

We recognize the effort the respondent has made to prevent any of the serious misconduct exhibited in these cases to occur any time in the future. We observe, however, that the respondent's actions are serious violations causing real harm to his clients. We conclude that a suspension of 1 year is not an appropriate sanction

under all the circumstances of this case. The more appropriate sanction in this case is a 3-year suspension from the practice of law in the state of Kansas.

Nevertheless, we acknowledge the efforts of the respondent and give full consideration to the entire record before this court, including the additional exhibits submitted to this court and discussed during the oral arguments. Thus, if the respondent submits a motion to this court after the first year of his suspension has passed requesting reinstatement of his probationary plan, we would entertain that motion subject to the following conditions:

Before submitting any motion to this court, the respondent must present to the Disciplinary Administrator a plan of probation addressing his then-present circumstances as well as a proposed plan of practice as a Kansas attorney, addressing those factors addressed in his original probationary plan that remain applicable, including evidence of ongoing treatment for depression along with a current assessment of that condition from a clinician. If the Disciplinary Administrator approves the probationary plan submitted by the respondent, that approval shall be attached to the respondent's motion to suspend his remaining 2 years of his suspension. If his probationary plan is not approved by the Disciplinary Administrator, the respondent may file his motion without such approval.

This court will then consider the respondent's motion to suspend the balance of his 2-year suspension. If the court approves the probation plan, the court will suspend the remaining 2 years of the respondent's suspension and place the respondent on probation for a period of 2 years subject to conditions contained in such order. If the court denies the respondent's motion, the respondent shall complete the term of his 3-year suspension from practicing law in the state of Kansas.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that James A. Cline be suspended from the practice of law in the state of Kansas for a period of 3 years, effective the date of this opinion in accordance with Supreme Court Rule 203(a)(2) (2008 Kan. Ct. R. Annot. 266).

IT IS FURTHER ORDERED that after a period of 1 year, the respondent may apply by motion to this court for a suspension of the remaining 2 years of his 3-year suspension under the provisions set forth in this opinion. If such application is approved, additional orders will be entered by this court. If the application is not approved, the respondent shall complete the term of his 3-year suspension.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2008 Kan. Ct. R. Annot. 350), and in the event the respondent would seek reinstatement, he shall comply with Supreme Court Rule 219 (2008 Kan. Ct. R. Annot. 365).

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that the costs herein be assessed to the respondent.