No. 103,062

In the Matter of STEVEN RAY WIECHMAN, *Respondent.*
(222 P.3d 485)

Opinion filed January 22, 2010.

*Frank D. Diehl,* deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett,* disciplinary administrator, was on the formal complaint for petitioner.

*John J. Ambrosio,* of Ambrosio & Ambrosio Chtd., of Topeka, argued the cause, and *Steven Ray Wiechman,* respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Steven Ray Wiechman, of Topeka, an attorney admitted to the practice of law in Kansas in 1974.

On December 3, 2008, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). On January 9, 2009, the respondent filed an answer to the formal complaint. On June 2, 2009, a hearing was held before a panel of the Kansas Board for Discipline of Attorneys, where the respondent appeared in person and was represented by counsel. The hearing panel determined that the respondent violated KRPC 1.8(a) (2009 Kan. Ct. R. Annot. 483) (conflict of interest) and KRPC 8.4(g) (2009 Kan. Ct. R. Annot. 602) (conduct adversely reflecting on lawyer's fitness to practice law). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"FINDINGS OF FACT

. . . .
"2. In approximately 2000, the Respondent represented [D.C.] in a bankruptcy proceeding. [D.C.] was satisfied with the Respondent's representation regarding the bankruptcy.
"3. Thereafter, from time to time, the Respondent came into the restaurant where [D.C.] is employed. [D.C.] is and has been employed by [a restaurant] as a professional server.

"4. In 2006 and 2007, [D.C.] was injured in two separate car accidents. As a result of the accidents, [D.C.] suffers ongoing pain.

"5. Because the Respondent previously represented her and because she saw him in the restaurant from time to time, in April, 2007, when [D.C.] needed an attorney, she sought out the Respondent. [D.C.] met with and retained the Respondent to represent her.

"6. During their first meeting, [D.C.] and the Respondent also initially met with an insurance adjuster. After the insurance adjuster left the office, the Respondent and [D.C.] were alone in his office. At that time, the Respondent told [D.C.] how attracted he had always been to her.

"7. The Respondent told [D.C.] that he had noticed how much pain she was [in] and offered to give [D.C.] some all-natural joint and muscle pain lotion and some all-natural pain relievers. [D.C.] accepted the Respondent's offer.

"8. The Respondent retrieved the lotion and the pain relievers and returned to his office. The Respondent offered to rub some of the lotion on [D.C.'s] back for her. [D.C.] reluctantly agreed. [Footnote: [D.C.'s] account of what occurred next was completely at odds with the Respondent's account. Based upon the demeanor of the witnesses and other evidence presented to the Hearing Panel, the Hearing Panel finds that [D.C.'s] testimony is credible. The Hearing Panel, therefore, finds that the Respondent's testimony in this regard lacks credibility.]

"9. Standing behind [D.C.], the Respondent raised the back of [D.C.'s] shirt and rubbed lotion on [her] upper back. While rubbing lotion on [her] back, the Respondent grabbed [D.C.] around her waist and pulled her torso toward the Respondent's body. As a result, [D.C.'s] backside was pressed up against his groin.

"10. After the Respondent completed rubbing the all-natural joint and muscle pain lotion on [D.C.'s] back, the Respondent began talking with [her] regarding a program called Fortune High Tech. Fortune High Tech is a pyramid marketing scheme. The Respondent encouraged [D.C.] to buy into the program by paying him $300 to join up as a manager.

"11. [D.C.] told the Respondent that she would think about it. At the end of their meeting, the Respondent hugged [D.C.] and kissed her on the lips.

"12. Later, [D.C.] received a telephone call that the employment contract was ready for her to sign. On May 8, 2007, [D.C.] returned to the Respondent's office to sign the contract, officially retaining the Respondent to represent her interests in the two automobile accidents.

"13. During this second meeting, the Respondent and [D.C.] were again alone in his office. [D.C.] signed the contract and attempted to quickly leave the Respondent's office. The Respondent, again, began discussing the Fortune High Tech program with [D.C.]. The Respondent, again, attempted to persuade [D.C.] to buy into the program. [D.C.] told the Respondent that she was not sure about the program. When [D.C.] stood to leave, the Respondent told her that she could not leave without giving him a hug. The Respondent again hugged and kissed [D.C.].

"14.    Following the second meeting, the Respondent called [D.C.] and asked [her] if she would watch a video about Fortune High Tech. [D.C.] agreed to meet with the Respondent and watch the video. Because she did not want to be alone with the Respondent and because she thought that it would cut the meeting short, she brought her two-year old grandson with her to the meeting. The Respondent and his wife met [D.C.] and her grandson at [a restaurant] in Topeka, Kansas.

"15.    During the meeting, the Respondent took [D.C.'s] grandson and went for a walk so that [D.C.] could watch the video without being interrupted. After she watched the video, [D.C.] told the Respondent and his wife that she needed to think about it.

"16.    The Respondent called [D.C.] following their third meeting and asked her what she thought about the Fortune High Tech program. [D.C.] told the Respondent that she was discussing it with her kids because she was not sure about joining the program. At the time the Respondent called [D.C.], she was on her way out to dinner with her daughter and her two grandsons. The Respondent offered to meet [D.C.] and her family at the restaurant. [D.C.] agreed. At the restaurant, the Respondent and his wife again discussed the Fortune High Tech program with [D.C.]. During that conversation, [D.C.] was pressured to join by the Respondent when he told her she would only have to pay $100.00 instead of $300.00. The Respondent told [D.C.] that he would pay the other $200.00 and then take the $200.00 from the settlement of the automobile accident cases. [D.C.] wrote out a $100.00 check to Mrs. Wiechman.

"17.    Fortune High Tech has an unlimited number of levels. After becoming a manager, a participant can become a field trainer. In order to receive compensation, the participants down-line must purchase at least three products on a monthly basis. Thus, in order for the Respondent to make any money from [D.C.'s] participation, [D.C.] would have to purchase at least three products on a monthly basis.

"18.    After [D.C.] joined the program, Mrs. Wiechman began repeatedly calling [her] to encourage her to participate in conference calls regarding Fortune High Tech. The conference calls were to take place at 9:00 p.m. Because [D.C.] wakes up at 4:00 a.m. to get ready for work, she was not available for conference calls at 9:00 p.m.

"19.    Over time, Mrs. Wiechman grew upset with [D.C.] for not participating in the conference calls. Eventually, [D.C.] stopped answering her telephone when the Respondent or Mrs. Wiechman called.

"20.    After [D.C.] retained the Respondent to represent her interests related to the two automobile accidents, she was contacted by the insurance companies about the accidents. The insurance companies were unaware that the Respondent was representing her interests. [Footnote: [D.C.] received a copy of a letter that the Respondent purportedly sent to [D.C.'s] insurance company informing it that he would be representing [D.C.]. However, the record is void of any reference to any correspondence from the Respondent to the insurance companies of the other drivers in the two accidents.]

"21. On January 7, 2008, [D.C.] terminated the Respondent's representation. On January 8, 2008, [D.C.] filed a complaint against the Respondent with the Disciplinary Administrator's office.

## "CONCLUSIONS OF LAW

"1. At the hearing on this matter, the Respondent stipulated that he violated KRPC 1.8 and KRPC 8.4(g). As a result, the Hearing Panel concludes, as a matter of law, that the Respondent violated KRPC 1.8(a) and KRPC 8.4(g), as detailed below.

"2. KRPC 1.8(a) provides:

'(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; and

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.'

The Respondent violated KRPC 1.8(a) when he entered into a business transaction the Fortune High Tech program with [D.C.] without complying with the requirements of KRPC 1.8(a)(1), KRPC 1.8(a)(2), and KRPC 1.8(a)(3). Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.8(a).

"3. 'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The Respondent engaged in conduct that adversely reflects on his fitness to practice law when he (1) told [D.C.] that he has always been attracted to her, (2) raised [her] shirt, (3) applied lotion to her back, (4) grabbed her by the waist and pulled her to him so that her backside was pressing against his groin, (5) told [D.C.] she could not leave until she gave him a hug, (6) hugged and kissed [D.C.] on two occasions, and (7) pressured [D.C.] into buying into the Fortune High Tech program. The Respondent's extreme conduct in this case seriously adversely reflects on his fitness to practice law. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(g).

## "AMERICAN BAR ASSOCIATION
## STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to

be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to his client to refrain from engaging in conflicts of interest. The Respondent also violated his duty to his client, to the legal profession, and to the public to maintain his personal integrity.

"*Mental State.* The Respondent negligently violated his duty to his client to refrain from engaging in conflicts of interest. The Respondent knowingly violated his duty to his client, to the legal profession, and to the public to maintain his personal integrity.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual serious injury to [D.C.].

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factor[s] present:

"*Prior Disciplinary Offenses.* The Respondent has twice previously been informally admonished for violating the rules that regulate the legal profession. On January 26, 1995, the Disciplinary Administrator informally admonished the Respondent for violating KRPC 8.4(g). In that case, the Respondent hugged his client, touched his client's buttocks, kissed his client, and informed his client that he and his wife have an understanding regarding relationships outside their marriage. Also, on April 13, 1995, the Disciplinary Administrator again informally admonished the Respondent. In this case, the Respondent violated KRPC 4.4. The Respondent failed to forward funds held in behalf of his client's ex-wife for a period of four months. Additionally, the Respondent received checks that were to be forward[ed] to his client's ex-wife. The Respondent placed the checks in his file and failed to forward the checks to his client's ex-wife until after the checks were expressly stale.

"*Dishonest or Selfish Motive.* The Respondent's misconduct was motivated by selfishness. After [D.C.] became a manager in Fortune High Tech, the Respondent stood to gain financially if [D.C.] were to purchase items as part of her participation. Additionally, engag[ing] in physical conduct with his client was likewise selfish.

"*A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct. The Respondent admitted that he solicited clients, other than [D.C.], to participate in multi-level marketing companies. Further, the Respondent acknowledged that the misconduct that gave rise to the first informal admonition also involved inappropriate touching of a female client.

"*Multiple Offenses.* The Respondent violated KRPC 1.8(a) and KRPC 8.4(g). As such, the Respondent committed multiple offenses.

"*Refusal to Acknowledge Wrongful Nature of Conduct.* While the Respondent acknowledged some of the misconduct, he refused to acknowledge the true extent

of the misconduct. Accordingly, the Hearing Panel concludes that the Respondent refused to acknowledge the wrongful nature of his misconduct.

"*Vulnerability of Victim*. [D.C.] was extremely vulnerable to the Respondent's misconduct. [D.C.] was injured and unsophisticated in legal matters. She went to the lawyer that had previously helped her. Further, despite the fact that the Respondent knew that [D.C.] had limited income, the Respondent pressured her into joining Fortune High Tech and spending $100.00 on something that she did not want or need.

"*Substantial Experience in the Practice of Law*. The Respondent was admitted to the practice of law in 1974. At the time of the hearing, the Respondent had been practicing law for 35 years. As such, the Respondent has substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The Respondent enjoys the respect of his peers as evidenced by several letters received by the Hearing Panel as well as the testimony of Alan Alderson.

"*Remoteness of Prior Offenses*. The Respondent's previous misconduct was remote in time, but not in character, to the present offenses.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.33  Reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client.'

'7.2  Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

'8.2  Suspension is generally appropriate when a lawyer has been reprimanded for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

'8.3  Reprimand is generally appropriate when a lawyer:

(a)  negligently violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession; or

(b)  has received an admonition for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.'

## "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be censured and that the censure be published in the Kansas Reports. The Disciplinary Administrator also recommended that the Respondent be ordered to refrain from meeting with female clients unless another female person is present throughout the meeting. Finally, the Disciplinary Administrator recommended that the Respondent be required to undergo a follow-up evaluation with Dr. Hough to ensure that the Respondent refrains from touching female clients in an inappropriate manner. The Respondent joined in the Disciplinary Administrator's recommendation of published censure with conditions.

"Based upon the findings of fact, conclusions of law, and the Standards listed above, a majority of the Hearing Panel recommends that the Respondent be suspended from the practice of law for a period of six months. Additionally, a majority of the Hearing Panel recommends that before the Respondent is reinstated to the practice of law, that the Respondent undergo a reinstatement hearing before a Hearing Panel. At the reinstatement hearing, the Respondent should be required to establish how he has addressed the issue of inappropriate touching of female clients. The Respondent's evidence should include testimony from a treating psychologist or psychiatrist regarding this matter.

"Costs are assessed against the Respondent in an amount to be certified by the office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (citing *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]); see Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 321).

The respondent filed no exceptions to the panel's final hearing report. Thus, the hearing panel's final report is deemed admitted. Supreme Court Rule 212(c) (2009 Kan. Ct. R. Annot. 337). Upon our review of the entire record we conclude that the panel's findings of fact are supported by clear and convincing evidence and support the panel's conclusions of law. We therefore adopt those findings and conclusions. With respect to the discipline to be imposed, the panel's recommendation is advisory only and shall not prevent the court from imposing a different discipline. *In re Cline*,

289 Kan. 834, 846, 217 P.3d 455 (2009); Supreme Court Rule 212(f).

We consider the violations of respondent to be serious as they relate to this court's responsibility to protect the citizens of this state from the conduct exhibited in respondent's case.

Respondent's actions in practically forcing his client to invest in a pyramid scheme wholly unrelated to the best interest of his client and his legal representation violated KRPC 1.8(a)(3). Respondent's client had limited means and was unsophisticated in legal matters. She sought legal help and in the process of rendering assistance, respondent "pressured her into joining Fortune High Tech and spending $100.00 on something that she did not want or need." Respondent's client was vulnerable and respondent exploited her vulnerability.

During the course of his representation, respondent engaged in conduct that adversely reflects on his fitness to practice law. KRPC 8.4(g). Respondent again exploited the vulnerability of his client when he

> " '(1) told [D.C.] that he has always been attracted to her, (2) raised [her] shirt, (3) applied lotion to her back, (4) grabbed her by the waist and pulled her to him so that her backside was pressing against his groin, (5) told [D.C.] she could not leave until she gave him a hug, (6) hugged and kissed [D.C.] on two occasions, and (7) pressured [D.C.] into buying into the Fortune High Tech program.' "

The above allegations are admitted by respondent and relate directly to our responsibility to protect the public interest of those citizens dealing with licensed attorneys in this state.

Our responsibility also extends to respondent in weighing the violations established and our consideration of discipline as it relates to respondent's best interest.

We note that respondent enjoys the respect of his peers as evidenced by several letters of support submitted on his behalf. We also acknowledge that respondent was favored with personal testimony supporting his practice and reputation.

We also note that during 1995 respondent received two informal admonishments for his conduct in the practice of law. While this previous misconduct is remote, one informal admonishment be-

comes important because the misconduct involves similar conduct to the violation established in this case.

"The Respondent has . . . been informally admonished for violating the rules that regulate the legal profession. On January 26, 1995, the Disciplinary Administrator informally admonished the Respondent for violating KRPC 8.4(g). In that case, the Respondent hugged his client, touched his client's buttocks, kissed his client, and informed his client that he and his wife have an understanding regarding relationships outside their marriage."

We acknowledge that a minority of the hearing panel recommended published censure as opposed to the majority's recommendation for suspension from the practice of law. The concurring and dissenting opinion stated: "Since under Standard 4.33 reprimand is generally appropriate for Respondent's KRPC 1.8(a) violation, the majority of the panel is apparently recommending suspension because of the KRPC 8.4(g) violation. I find Standard 8.3(b) applicable to this violation."

Standard 8.3(b) states that reprimand is appropriate when a lawyer "has received an admonition for the same or similar misconduct and engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession." ABA Standard 8.3(b).

However, the majority of the panel clearly stated that it considered not only Standards 4.33 and 8.3 but also 7.2, which states: "Suspension is generally appropriate when a lawyer *knowingly* engages in conduct that is a violation of a duty as a professional and causes injury or potential injury to a client, the public, or the legal system." (Emphasis added.)

The hearing panel found that "Respondent *negligently* violated his duty to his client to refrain from engaging in conflicts of interest. The Respondent *knowingly* violated his duty to his client, to the legal profession, and to the public to maintain his personal integrity." (Emphasis added.) Based on these findings, the dissenting panel member is correct that reprimand under Standard 4.33 is the appropriate discipline for the violation of KRPC 1.8(a) (2009 Kan. Ct. R. Annot. 483). However, the dissenting panel member failed to consider that the panel found respondent knowingly violated KRPC 8.4(g) to which Standard 7.2 is appropriate.

Finally, we would note that in his argument before this court, respondent acknowledged that his misconduct resulted from poor judgment, ignorance, and stupidity. While this may be true, it falls short of an acknowledgment of the true extent of his misconduct and the impact such misconduct had upon an extremely vulnerable client.

We remain concerned about the public interest and are not satisfied with respondent's plan to address the violations that occurred. Respondent has offered the following: He will have no one-on-one meetings with female clients; he will only hold meetings during regular office hours; a female staff member will sit in on all meetings with clients; he will only meet with female clients in his first floor conference room with a female staff member close by; and he will not offer marketing projects to clients.

We acknowledge that all of the above should be in place when respondent again seeks to practice law in this state. We also think it wise for respondent to follow a recommendation of the Disciplinary Administrator to "undergo a follow-up evaluation with Dr. Hough to ensure that the respondent refrains from touching female clients in an inappropriate manner."

For the reasons set forth, we reject the panel dissent's recommendation of published censure. We also reject the recommendation of the Disciplinary Administrator. We agree with the panel majority that suspension is the more appropriate discipline and determine that a 1-year suspension is the appropriate discipline, based upon a consideration of the entire record, the public interest, and the interest of respondent.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Steven Ray Wiechman be suspended from the practice of law in the state of Kansas for a period of 1 year, effective the date of this opinion in accordance with Supreme Court Rule 203(a)(2) (2009 Kan. Ct. R. Annot. 272) for violations of KRPC 1.8(a) (2009 Kan. Ct. R. Annot. 483) and KRPC 8.4(g) (2009 Kan. Ct. R. Annot. 602).

IT IS FURTHER ORDERED that the respondent shall comply with Rule 218 (2009 Kan. Ct. R. Annot. 361) and Rule 219 (2009 Kan.

Ct. R. Annot. 376), including a hearing, prior to readmission to the practice of law.

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that the costs herein be assessed to the respondent.