No. 103,195

In The Matter of DAVID J. HARDING, *Respondent.*
(223 P.3d 303)

Opinion filed January 22, 2010.

*Stanton A. Hazlett*, disciplinary administrator, argued the cause, and was on the formal complaint for petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio Chtd., of Topeka, argued the cause, and *David J. Harding*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against David J. Harding, of WaKeeney, an attorney admitted to the practice of law in Kansas in 1974.

On March 23, 2009, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). On April 8, 2009, the respondent filed an answer to the formal complaint. On May 7, 2009, a hearing was held before a panel of the Kansas Board for Discipline of Attorneys, where the respondent appeared in person and was represented by counsel. The hearing panel determined that the respondent violated KRPC 1.6 (2009 Kan. Ct. R. Annot. 468) (confidentiality) and KRPC 1.13 (2009 Kan. Ct. R. Annot. 501) (organization as client). Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

### "FINDINGS OF FACT

. . . .

"2.    From 1978, until February 6, 2007, the Respondent was the City Attorney for the City of WaKeeney, Kansas (hereinafter 'the City'). Additionally, the Respondent has served as County Attorney for Trego County, Kansas (hereinafter 'the County') for much of that time.

"3.    In 1978, the Respondent requested that he be allowed to participate in the Kansas Public Employees Retirement System (hereinafter 'KPERS') by virtue of his employment with the City. The City Council considered and approved the Respondent's request.

"4. In addition to the City, beginning in 1978, the Respondent also participated in the KPERS program *via* his employment with the County.

"5. The Respondent's fee agreement with the City required the City to pay the Respondent a monthly retainer of $610. On pages 69-70 of Disciplinary Administrator's Exhibit 5, the Respondent explained what the City received for payment of the retainer. In addition to the retainer, the Respondent charged the City on an hourly basis for items not included in the retainer.

"6. In 2006, the Respondent requested that the City pay his hourly fees through payroll so that the hourly fees could be considered KPERS income.

"7. As a result of his request, Charlene Neish, a City Councilwoman, 'began to do research on the subject.' Ms. Neish believed 'that the City had been contributing to KPERS for [the Respondent] for over twenty-seven years even though he was not eligible.'

"8. At the September 5, 2006, City Council meeting, a City Council member made a motion to leave the Respondent on KPERS with the City. The motion died for a lack of a second. The City Council agreed, however, to request additional information from KPERS.

"9. At some point, the Respondent discovered that certain City Officials were using City property or allowing their associates to use City property for their personal benefit.

"10. On September 20, 2006, the Respondent called Tom Drees, County Attorney for Ellis County, Kansas. The Respondent disclosed information to Mr. Drees regarding his clients which he had obtained by virtue of his attorney/client relationship. The Respondent discussed whether the City Officials had violated the law. Mr. Drees instructed the Respondent to call the Disciplinary Administrator's office to discuss the Respondent's obligations to the City and City Officials.

"11. On October 3, 2006, the Respondent called Alexander Walczak, Deputy Disciplinary Administrator. Mr. Walczak advised the Respondent to start by discussing the issues regarding illegal conduct with the Mayor and the City Administrator.

"12. That same day, the Respondent arranged to meet with the Mayor and the City Administrator. At that meeting, the Respondent confronted the Mayor with some of the allegations of illegal conduct that concerned him. Specifically, the Respondent discussed whether the Mayor had allowed his family and friends to use City equipment.

"13. The Respondent's allegations upset the Mayor. During the meeting, the Mayor offered to pay $50 for the use of the City equipment. The Respondent refused to accept the $50 and informed the Mayor that there was going to be an inquisition to investigate possible criminal charges.

"14. As a result of Ms. Neish's research, prior to the October 3, 2006, City Council meeting, the City removed the Respondent from participation in KPERS.

"15. According to Laurie McKinnon of KPERS, in order to be eligible for participation in KPERS, a public employee must work 1,000 hours or more per year. Ultimately, Ms. McKinnon concluded that the Respondent was eligible to

participate in KPERS in all but the following years: 1978, 1988, 1989, 1990, 1991, and 1992.

"16. At the October 3, 2006, City Council meeting, the City Council held a discussion regarding the usage of cell phones provided by the City to City Officials. Apparently, the Mayor and the Chief of Police had exceeded their allotted minutes and, as a result, the City incurred additional charges. The Respondent did not participate in the discussion but obtained a copy of the cell phone records at the conclusion of the meeting.

"17. Following the October 3, 2006, City Council meeting but sometime before November 13, 2006, the Respondent met with Mr. Drees because the Respondent had concluded that someone should look into purported wrongdoing by the City Officials, including Ms. Neish, the Mayor and the Chief of Police. Mr. Drees agreed to investigate the purported wrongdoing.

"18. During that meeting, the Respondent provided Mr. Drees with information and documents relevant to Mr. Drees' investigation. In so doing, the Respondent provided Mr. Drees with confidential information that he obtained through his attorney/client relationship with the City and the City Officials. The Respondent provided Mr. Drees with a copy of the cell phone records the Respondent obtained at the conclusion of the October 3, 2006, City Council meeting.

"19. During the November 13, 2006, Trego County Commission meeting, the County Commissioners voted to appoint Mr. Drees as a Special Prosecuting Attorney.

"20. On January 19, 2007, Mr. Drees filed an inquisition investigating the actions of Ms. Neish, the Mayor, and the Chief of Police.

"21. At the January 29, 2007, City Council meeting, the City Council voted to cease paying the Respondent the monthly retainer. Instead, the City Council agreed to pay the Respondent $100 per hour. Additionally, at that meeting the Mayor and the Chief of Police presented the City Council with letters requesting that the City pay their costs associated with defending themselves in the inquisition.

"22. On January 31, 2007, Ms. Neish sent a letter to the City Administrator asking the City to pay her costs associated with defending herself in the inquisition. The Respondent obtained a copy of Ms. Neish's letter and immediately forwarded the letter to Mr. Drees and Mike Corn of the Hays Daily News.

"23. At the February 6, 2007, City Council meeting, Ms. Neish 'discussed with the Governing Body having an audit performed for any potential liability concerning the City's withholding on past KPERS for non-qualified individuals.' The City Council voted to have an audit performed. The Mayor discussed the Respondent's conflict of interest and the Respondent's failure to provide legal advice on matters the Respondent was investigating. Thereafter, the City Council voted to appoint a Special City Attorney and a Special City Prosecutor for an interim period.

"24. On March 8, 2007, the Western Kansas World published a letter the Respondent wrote. The confidential information included in his letter to the editor

was obtained by the Respondent through his attorney/client relationship. The Respondent's letter provided, in pertinent part, as follows:

. . . .

'3. Ms. Neish states to Mr. Millard that KPERS for the City Attorney is not 'allowed' or is 'illegal.' FACT: In 1979 the City of WaKeeney deemed the City Attorney position to be a KPERS covered position. In September of 2006, after 27 years, MS. [sic] Neish determined that it was not a KPERS covered position. The City Attorney position is a LEGAL covered KPERS position, and if you doubt this, please feel free to call Laurie McKinnon, General [Counsel] for KPERS at . . . . I also have a copy of her letter and the statute cited. To my knowledge Mr. Millard has never contacted KPERS for an unbiased ruling.

. . . .

'5. Originally the use of the city truck by an employee of Ms. Neish for approximately three weeks and use of a city truck by the Mayor for his son-in-law were the only known transgressions. The Mayor, at a meeting with the City Administrator and myself, was advised to stop such actions. The Mayor did not deny the use of the trucks and the only reason he gave was that it was owed because of the numerous hours of donated time to the city by this individual. At no time did the Mayor state that city council had given prior approval. The Mayor did slap down a $50 bill on the table. Neither the city [sic] Administrator nor myself have the authority to accept the money as a settlement.

'6. Ms. Neish did try to rewrite the city minutes six months after the fact. The City Administrator and myself talked to one council member who knew that the truck was being used, but she could not remember whether the conversation took place before, during, or after the meeting. She did not know a city employee would be used to dump the truck. The City Administrator Hardy Howard, Council member Bob Funk and myself do not recall a discussion concerning the use of a truck by Ms. Neish's employee at a City Council meeting. The city minutes DO NOT reflect any action by council. The City Administrator ordered the truck to be returned.

'7. The Chief of Police did pay $60 in 2002 for some city rock. In 2006, on a Saturday evening, the Chief of Police loaded city rock on private equipment and dumped it on the alley beside the Methodist Church and in a roadway behind the trees north of the Church. The alley is also adjacent to the Chief of Police's home. The Mayor at a city council meeting admitted giving the Chief of Police permission to do this. It would be worthwhile to drive the alley and roadway adjacent to his home and behind the Methodist Church.

'8. The Mayor did give away a usable fire hydrant. When asked about the fire hydrant by the City Administrator, he denied knowledge. Once the location of the fire hydrant was discovered, the City Administrator told him to return it to the possession of the City. The Mayor did as he was told and returned the fire hydrant to the City or as Mr. Millard states, he corrected his actions.

'9. City cell phones were issued to the Mayor, Police Chief, City Administrator and City Superintendent. I admit that I did not tell them that the cell phones could not be used for private use. I asked for all cell phone records. The city has those records for your inspection and I would also make those records available. The times and number of calls to Ms. Neish are of special significance.

'10. On August 23, 2006, the Mayor pled guilty to giving alcohol to a work-release prisoner under his supervision. By the reasoning in Mr. Millard's editorial, since I, in my capacity as City Attorney, did not advise Mayor Deutscher that he should not give alcohol to a prisoner, I would be responsible for the Mayor's action! Some things just go without saying and common sense should prevail.

'Special privileges have been given to some, but not to all. No citizen should stand above another.

"25. Shortly before the election in 2007, the Respondent received a letter and 'reviewed it for accuracy.' After receiving and reviewing it, the Respondent sent the letter to the residents of WaKeeney, Kansas. The letter provided, in pertinent part, as follows:

. . . .

'. . . At this point, the "open public City Council Meeting" is a joke. It will remain a joke until the irresponsible officials are removed that believe that two or three of them can make better decisions in private for the citizens of WaKeeney than the Council as a whole could make in an open, honest public meeting. These irresponsible public officials have made a mockery of "public" City Council Meetings. They have stacked the deck against ever having an honest, open City Council meeting by allowing themselves the right to "rig" the issues and the outcome in private. . . .

'How many of us could keep our jobs if we provided alcohol to a work release prisoner in our custody and allowed them to drink it at the City Building? Mayor Kenneth Deutscher did and he's still here!! This past winter, during the ice storms, Mayor Deutscher and Council Member Neish made the decision to purchase meals for Deutscher' [sic] son-in-law, Kenny Nowlin, and the rest of his Western Coop Electric Crew **OUT OF CITY FUNDS!!** The meals were delivered to Ransom with a city vehicle. It wasn't like Western Coop Electric left them high and dry with nothing to eat. During those storms, Western provided food for all of their crews, every day. If the food Western provided wasn't quite what Mr. Nowlin wanted to eat, and if Mayor Deutscher and Ms. Neish wanted to treat them to something else, that's fine, but the money should have come out of their personal pockets and not City funds. These are just two examples of poor judgment and BAD decisions.

'Other bad decisions already in the Western Kansas World: (1) The disputed use of a city truck [sic] Ms. Neish's employee; (2) The admitted use of city equipment by the Mayor and his son-in-law; (3) Giving permission to the Chief of Police Terry Eberle to load city rock onto private equipment to rock the

alley around the Eberle property; (4) The Mayor giving away a city owned, usable fire hydrant making it necessary for the city to purchase another one; (5) Unauthorized private use of city cell phones by Mayor Deutscher and Chief of Police Terry Eberle.

'No one is trying to take away Mayor Deutscher's good accomplishments during his tenure as Mayor of WaKeeney, however, the good from the past cannot outweigh the really bad, irresponsible decisions he is making NOW. Accountability is part of making decisions, whether good or bad. Mayor Deutscher has readily accepted credit for the good but, so far, accountability for his poor judgment and bad decisions has not happened.

. . . .

'On Tuesday April, [sic] 3, 2007, we have the opportunity to go to the polls. If you are OK with bad decisions and backroom politics then keep what we've got and don't complain. If you think it's time to bring OUR city business back into an open public forum, take advantage of your right to vote and vote for CHANGE. Vote to . elect responsible public officials that want to serve, and believe they should serve, in full view of the public, like it was always meant to be. At this point, changing public officials is the only way to stop the irresponsible behavior, poor judgment, and backroom politics that is currently common practice in the City of WaKeeney.'

"26.	In the election, the Mayor was defeated.

"27.	On April 27, 2007, the Mayor filed a complaint against the Respondent with the Disciplinary Administrator's office. On May 2, 2007, Ms. Neish filed a complaint against the Respondent with the Disciplinary Administrator's office. On May 18, 2007, the Chief of Police filed a complaint against the Respondent with the Disciplinary Administrator's office.

"CONCLUSIONS OF LAW

"1.	Based upon the Respondent's stipulations and the above findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.6 and KRPC 1.13, as detailed below.

"2.	KRPC 1.6 provides:

'(a)	A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

'(b)	A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1)	To prevent the client from committing a crime; or

(2)	to comply with requirements of law or orders of any tribunal; or

(3)	to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was

involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.'

The Respondent violated KRPC 1.6 when he repeatedly disclosed confidential information that he obtained *via* his attorney/client relationship with the City and City Officials. Thus, the Hearing Panel concludes that the Respondent violated KRPC 1.6.

"3. The Kansas Supreme Court has adopted a rule to specifically address the situation where an attorney has an organization for a client. That special rule [KRPC 1.13] provides:

'(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

'(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include among others:

(1) asking for reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.

'(c) If, despite the lawyer's efforts in accordance with paragraph (b), the highest authority that can act on behalf of the organization insists upon action, or a refusal to act, that is clearly a violation of law and is likely to result in substantial injury to the organization, the lawyer shall follow Rule 1.16.

'(d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

'(e) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official

of the organization other than the individual who is to be represented, or by the shareholders. KRPC 1.13.'

The Respondent failed to take measures which would minimize disruption of the City and reduce the risk of revealing confidential information when he disclosed confidential information to Mr. Drees, to Mr. Corn, and to the newspaper in his letter to the editor. The Respondent's conduct resulted in substantial injury to the City. The Respondent failed to proceed in a manner that was in the best interest of the City. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.13(b). Further, the Respondent violated KRPC 1.13(b)(3) when he failed to try to rectify the misconduct within the City by referring the matter to the highest authority in the City. Finally, the Respondent violated KRPC 1.13(d) when he failed to advise Ms. Neish, the Mayor, and the Chief of Police that his representation of the City might be adverse to them. Accordingly, the Hearing Panel concludes that the Respondent repeatedly violated KRPC 1.13.

"AMERICAN BAR ASSOCIATION
STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated*. The Respondent violated his duty to his client.

"*Mental State*. The Respondent knowingly violated his duty.

"*Injury*. As a result of the Respondent's misconduct, the Respondent caused actual injury to his client.

"*Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factor present:

"*Selfish Motive*. The Respondent's conduct was motivated by selfishness. The Respondent viewed Ms. Neish's investigation into his KPERS eligibility as a personal attack. The Respondent selfishly acted in response to the perceived attack.

"*A Pattern of Misconduct*. The Respondent engaged in a pattern of misconduct by revealing confidential information on more than one occasion.

"*Vulnerability of Victim*. Ms. Neish, the Mayor, and the Chief of Police were vulnerable to the Respondent's misconduct as they relied on the Respondent to act as their lawyer.

"*Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the Respondent to the practice of law in the state of Kansas in 1974. At the time the misconduct began, the Respondent had been practicing law for more than 32 years. As such, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Absence of a Prior Disciplinary Record.* The Respondent has not previously been disciplined.

"*The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* At the hearing on this matter, the Respondent freely acknowledged that he violated KRPC 1.6 and KRPC 1.13.

"*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent enjoys the respect of his peers as evidenced by a number of letters received by the Hearing Panel.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.22 Suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.

'4.23 Reprimand is generally appropriate when a lawyer negligently reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed and this disclosure causes injury or potential injury to a client.'

## "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be censured and that the censure be published in the Kansas Reports. The Respondent joined in the recommendation made by the Disciplinary Administrator.

"Notwithstanding the mitigating factors, it appears that the appropriate recommendation in this case would be for a suspension from the practice of law for a period of 90 days. However, the mitigating factors are considerable and, as a result, the Hearing Panel accepts the recommendation made by the parties and unanimously recommends that the Respondent be censured by the Kansas Supreme Court. The Hearing Panel further recommends that the censure be published in the Kansas Reports.

"Costs are assessed against the Respondent in an amount to be certified by the office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if

they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (citing *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]); see Supreme Court Rule 211(f) (2009 Kan. Ct. R. Annot. 321).

The respondent filed no exceptions to the panel's final hearing report. Thus, the hearing panel's final report is deemed admitted. Supreme Court Rule 212(c) (2009 Kan. Ct. R. Annot. 337). Upon our review of the entire record we conclude that the panel's findings of fact are supported by clear and convincing evidence and support the panel's conclusions of law. We therefore adopt those findings and conclusions. With respect to the discipline to be imposed, the panel's recommendation is advisory only and shall not prevent the court from imposing a different discipline. *In re Cline*, 289 Kan. 834, 217 P.3d 455 (2009); Supreme Court Rule 212(f) (2009 Kan. Ct. R. Annot. 337).

The respondent knowingly violated his duty to his client causing actual injury. His conduct was motivated by anger and selfishness. On more than one occasion he publicly revealed confidential information obtained while representing his client. Through his efforts some of this information surfaced in the local newspaper. The respondent through the special prosecuting attorney was able to initiate an inquisition concerning activities of certain city officials. The inquisition was subsequently dismissed by the district court. Within the community of Wakeeney, respondent's client suffered injury and certainly the reputations of some council members were damaged by the misconduct of the respondent.

The respondent engaged in his misconduct because the City made inquiries as to whether he qualified for participation in KPERS. The inquiry threatened his KPERS benefits, and respondent set out to undermine the reputation of certain city officials responsible for the KPERS inquiry. There is no doubt that his conduct injured his client.

The Disciplinary Administrator recommends a published censure. Respondent joins in that recommendation. However, the panel correctly concludes that, based upon ABA Standard 4.22, suspension from the practice of law is a more appropriate discipline

based upon the intentional misconduct of the respondent. We agree with this determination but disagree with the ultimate recommendation of the panel that the discipline be a published censure because of the considerable mitigating circumstances.

We acknowledge that numerous letters of support from attorneys demonstrate that respondent enjoys the respect of his peers, that he has practiced law for 32 years without any disciplinary action, and that he acknowledged his wrongful conduct and apologized to his client for his misconduct. We are not convinced that the mitigating circumstances warrant published censure where the activity of respondent calls for suspension from the practice of law. We are concerned about the harm done, the respondent's disclosure of confidential information, and the damage caused to the reputations of some of the city officials. We may not ignore respondent's angry and selfish response. A minority of the court would impose a greater discipline.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that David J. Harding be suspended for a period of 90 days from the practice of law in the state of Kansas, effective the date of this opinion in accordance with Supreme Court Rule 203(a)(2) (2009 Kan. Ct. R. Annot. 272).

IT IS FURTHER ORDERED that the respondent shall comply with Rule 218 (2009 Kan. Ct. R. Annot. 361).

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that the costs herein be assessed to the respondent.