No. 108,169

In the Matter of MATTHEW M. DIAZ, *Respondent.*

(288 P.3d 486)

Opinion filed November 21, 2012.

*Alexander M. Walczak*, Deputy Disciplinary Administrator, argued the cause and was on the formal complaint for the petitioner.

*Jack Focht*, of Foulston Siefkin LLP, of Wichita, argued the cause, and *Matthew M. Diaz*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Matthew M. Diaz, of Forest Hills, New York, an attorney admitted to the practice of law in Kansas in 1995.

On October 20, 2010, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on November 8, 2010. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on October 19, 2011, where the respondent was personally present and represented by counsel. The hearing panel determined that respondent violated KRPC 1.6(a) (2011 Kan. Ct. R. Annot. 480) (confidentiality) and 8.4(b) (2011 Kan. Ct. R. Annot. 618) (commission of a criminal act reflecting adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer).

The panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

### "FINDINGS OF FACT

. . . .

"22.    In December, 1994, the Respondent received a commission from the United States Navy to serve as a judge advocate. The Respondent was admitted to the practice of law in the State of Kansas on April 28, 1995. [Footnote: The Respondent's license to practice law in the State of Kansas has been temporarily suspended, due to his convictions, for more than three years.]

"23.    In July, 2004, the Respondent, a deputy staff judge advocate, was assigned to the Joint Task Force in Guantanamo Bay, Cuba. The Respondent remained at Guantanamo Bay, Cuba, until January 15, 2005.

"24. On June 28, 2004, the United States Supreme Court issued its opinion in *Rasul v. Bush*, 541 U.S. 466 (2004). In that case, the United State Supreme Court held that the habeas corpus statute, 28 U.S.C. § 2241, entitled the Guantanamo Bay detainees to challenge the validity of their detention. [541 U.S.] at 483. The Respondent read *Rasul* on his way to Cuba.

"25. On December 17, 2004, Barbara Olshansky, the Deputy Legal Director for the Center of Constitutional Rights sent a letter to the Honorable Gordon R. England, the Secretary of the Navy. The Respondent and his immediate supervisor, Lt. Colonel Randall Keys were sent copies of the letter.

"26. In her letter, Ms. Olshansky stated:

'As you know, the United States presently acknowledges detaining approximately 550 individuals at the Guantanamo Bay Naval Base, Cuba. Approximately 63 of those individuals have filed habeas corpus petitions with the D.C. district court. We intend to take any legal action necessary, including filing habeas petitions on behalf of the remaining detainees, in order to ensure that every detainee at Guantanamo has the opportunity to avail themselves of the decision in *Rasul*.

'Accordingly, we are writing to request that you provide us with the names and other identifying information about each person held at Guantanamo who[se] identity has not yet been made known and who has not yet filed a petition for a writ of habeas corpus ("unidentified detainee" or "detainee").'

"27. After Ms. Olshansky's letter was received, the Respondent understood that the government's response was to not release the requested information.

"28. The Respondent had strong feelings about a prisoner's right to habeas corpus proceedings. When the Respondent was sixteen years old, his father, a nurse, was arrested and charged with 12 counts of murder for injecting patients with a lethal dose of Lidocaine. Later, the Respondent's father was convicted and sentenced to death. The Respondent's father's death sentence was not carried out because of a pending habeas corpus action. In fact, the Respondent's father's habeas corpus proceeding remained pending until he died in prison of natural causes in August, 2010.

"29. For a period of three weeks, the Respondent contemplated what he could do to comply with the law and follow his orders.

"30. During that time, the Respondent failed to seek or obtain guidance regarding his conflict between his ethical duties and military duties. Pursuant to § 13, Rule 1.13 of JAG Instruction 5803.1C, the Respondent could have sought and obtained guidance, but did not. Additionally, the Respondent failed to seek or obtain a formal ethics opinion pursuant to § 10(b) of JAG Instruction 5803.1C. The Respondent also failed to seek or obtain an informal ethics opinion pursuant to § 12(a) of JAG Instruction 5803.1C. Further, at his court-martial, the Respondent testified that he could have gone to Lt. Col. Keys, General Hood, the Chief of Staff, the Inspector General, or a Congressperson regarding this issue. More-

over, at the hearing on this matter, the Respondent testified that he could have gone to Admiral Gouder or Admiral Hudson for guidance. Finally, the Respondent testified that he could have contacted the Disciplinary Administrator for guidance.

"31. From December 23, 2004, through January 4, 2005, Lt. Col. Keys was on Christmas leave and away from the office.

"32. During the evening hours on January 2, 2005, the Respondent returned to the staff judge advocate office and printed a list of detainees from the Joint Defense Information Management System from the secret computer. The list that the Respondent printed contained each detainee's full name, their internment serial number, their country of origin, their country of citizenship, and other identifying information including ethnicity, source identification number, and information regarding the detention or interrogation team assigned to each detainee. The list contained classified information.

"33. While contemplating what to do with the list, the Respondent maintained the list in a safe in the staff judge advocate's office.

"34. The Respondent purchased a large Valentine's Day card. The Respondent cut the list into strips and placed the strips into the card. The Respondent did not sign the card. The only return address listed was 'GTMO.' On January 14, 2005, the Respondent sent the card to Ms. Olshansky. Ms. Olshansky did not have a security clearance and was not authorized by the government to access detainee information.

"35. The Respondent knew that if he had the list in his belongings it would be found when he was leaving the island because his belongings were subject to search.

"36. When Ms. Olshansky received the list, she believed that it might be a hoax or a practical joke. She immediately contacted the federal judge handling the detainee litigation. The judge requested that the list be secured from Ms. Olshansky. An agent came to Ms. Olshansky's office, secured the list, and provided it to the judge. The judge realized that it was an actual list of detainees and should not have been released to Ms. Olshansky in that fashion. Thereafter, an investigation ensued.

"37. On March 3, 2006, the Respondent was interrogated and fingerprinted. Additionally, at that time, the Respondent provided writing samples.

"38. In August, 2006, the Respondent was charged in a three count complaint. The first charge alleged that the Respondent violated a lawful general regulation by wrongfully mailing classified secret information. The second charge alleged that the Respondent wrongfully and dishonorably transmitted classified documents to an unauthorized individual. The third charge alleged three different specifications, (1) that the Respondent made a print out of classified secret information with the intent to use the information to the injury of the United States or to the advantage of a foreign nation, (2) that the Respondent knowingly and willfully communicated classified secret information relative to national defense to a person not entitled to receive the information that could be used to injure

the United States or to the advantage of a foreign nation, and (3) that the Respondent knowingly removed materials containing classified information without authority and with the intention to retain such materials at an unauthorized location.

"39.   On May 17, 2007, a court-martial consisting of senior officers convicted the Respondent of the crime of [1] violating a lawful general regulation by wrongfully mailing classified secret information, [2] wrongfully and dishonorably transmitting classified documents to an unauthorized individual, [3] knowingly and willfully communicating classified secret information relative to national defense to a person not entitled to receive the information that could be used to injure the United States or to the advantage of a foreign nation, and [4] knowingly removing materials containing classified information without authority and with the intention to retain such materials at an unauthorized location.

"40.   The court-martial acquitted the Respondent of the most serious charge which was printing out the information with the specific intent to harm national security or to provide an advantage to a foreign government.

"41.   On May 18, 2007, the Respondent was dismissed from the Navy and sentenced to serve six months confinement. The Respondent served six months' confinement in 2007.

"42.   On August 8, 2007, counsel for the Respondent reported the Respondent's convictions to the Disciplinary Administrator.

"43.   On August 31, 2007, the Respondent submitted a clemency request. After reviewing the matters submitted in clemency, the Convening Authority approved the sentence.

"44.   On September 17, 2007, Captain H.H. Dronberger wrote to the Disciplinary Administrator regarding the Respondent. In the letter, Captain Dronberger stated:

> 'The Judge Advocate General permanently revoked Lieutenant Commander Diaz' certification under Article 27(b) of the Uniform Code of Military Justice, 10 U.S.C. § 827(b), thereby disqualifying him from representing members of the Naval Service before any forum in the Department of the Navy. The Judge Advocate General also revoked Lieutenant Commander Diaz' authority to provide legal assistance and prohibited him from providing any other legal services or advice in any matter under the cognizance and supervision of the Judge Advocate General.
>
> 'The Judge Advocate General found that Lieutenant Commander Diaz violated the "Rules of Professional Conduct of Attorneys Practicing Under the Cognizance and Supervision of the Judge Advocate General" by:
>
> a. committing a criminal act that reflects adversely on Lieutenant Commander Diaz' honesty, trustworthiness, and fitness as an attorney in other respects, and
>
> b. revealing confidential information relating to representation of his client without his client's consent.'

"45. On February 19, 2009, the United States Navy-Marine Corps Court of Criminal Appeals upheld the Respondent's convictions and sentence. In so doing, the Court stated:

'The appellant's argument that taking action for arguably pure and good motives excused his knowing violation of the law is nonsensical and dangerous. The Government, quoting an opinion by Justice Stevens and when he was serving in the 7th Circuit, succinctly summarized the flaw in the appellant's logic. Justice Stevens observed that "[o]ne who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making. . . . [a]n unselfish motive affords no assurance that a crime will produce the result its perpetrator intends.'

"46. Thereafter, on July 15, 2010, the United States Court of Appeals for the Armed Forces considered the Respondent's appeal. The United States Court of Appeals for the Armed Forces affirmed the lower court, concluding that 'any error on the part of the military judge to assess and ultimately admit [the Respondent]'s proffer of motive evidence . . . was harmless.'

## "CONCLUSIONS OF LAW

"47. Based upon the findings of fact, the decision of the Judge Advocate General, and Kan. Sup. Ct. R. 202, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.6(a) and KRPC 8.4(b), as detailed below.

"48. KRPC 1.6(a) provides:

'A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).'

The Respondent revealed confidential client information without authorization. If the Respondent disagreed with the actions taken by his client, the Navy, then the Respondent was duty bound to so inform those with decision making power within the Navy. The Hearing Panel believes that the Respondent could not publicly announce his disagreement, or his reasons therefor, as such a public disavowment would harm the interests of his client. The actions taken by the Respondent to disclose the confidential information being protected by his client violated his fiduciary responsibility to that client. Accordingly, the Hearing Panel concludes that the Respondent breached the trust of his client and violated KRPC 1.6(a).

"49. 'It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.' KRPC 8.4(b). In this case, the Respondent committed four crimes. The Respondent violated a lawful general regulation by wrongfully

mailing classified secret information. The Respondent wrongfully and dishonorably transmitted classified documents to an unauthorized individual. The Respondent knowingly and willfully communicated classified secret information relative to national defense to a person not entitled to receive the information that could be used to injure the United States or to the advantage of a foreign nation. And, the Respondent knowingly removed materials containing classified information without authority and with the intention to retain such materials at an unauthorized location. The crimes which the Respondent was convicted of adversely reflect on the Respondent's trustworthiness. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(b).

## "AMERICAN BAR ASSOCIATION
## "STANDARDS FOR IMPOSING LAWYER SANCTIONS

"50. In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"51. *Duty Violated*. The Respondent violated his duty to the public to maintain his personal integrity.

"52. *Mental State*. The Respondent knowingly violated his duty.

"53. *Injury*. As a result of the Respondent's misconduct, the Respondent caused potential serious injury to the public.

"54. *Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factor present:

"55. *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the Respondent to practice law in the state of Kansas in 1995. At the time of the misconduct, the Respondent has been practicing law for approximately 10 years.

"56. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"57. *Absence of a Prior Disciplinary Record*. The Respondent has not previously been disciplined.

"58. *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions*. The Respondent fully cooperated with the disciplinary process. Additionally, the Respondent admitted the facts that gave rise to the violations.

"59.  *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several affidavits received by the Hearing Panel.

"60.  In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.22  Suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client.

'5.11  Disbarment is generally appropriate when:

(a)  a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; . . .

(b)  a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

'5.22  Suspension is generally appropriate when a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process.'

## "RECOMMENDATION

"61.  The Disciplinary Administrator recommended that, based upon the Respondent's convictions, the conclusions of the Judge Advocate General, and the conclusions of the military courts, the Respondent be disbarred. Counsel for the Respondent argued that the Respondent has been disciplined enough and that no further discipline should be imposed.

"62.  The act of printing and sending classified and confidential information to an unauthorized person warrants significant discipline. The furtive nature of the Respondent's actions aggravate the malfeasance. Not only did the Respondent print the list which contained classified information from the secret computer, he also cut the list into pieces and placed the pieces into a Valentine's Day card so that the package appeared innocuous. Further, the Respondent's timing aggravates his conduct. The Respondent mailed the card the day before he left the island so as to reduce his chance of facing consequences for his actions.

"63.  The United States Court of Appeals for the Armed Forces also noted the Respondent's method of disclosure:

'. . . [The Respondent] copied classified material and sent it to a person not authorized to receive it. The clandestine method of disclosure—by sending it through the postal system cut up in a Valentine's Day card—suggests that

[the Respondent] knew at the time his actions warranted concealment. His failure to adhere to presidential directives and departmental regulations, including those regarding classified information and for addressing differences of legal views within the Department, demonstrates that [the Respondent] was not legally permitted to disregard the classified nature of the protected information.'

"64. Accordingly, based upon the findings of fact, conclusions of law, the conclusions of the Judge Advocate General, the conclusions of the military courts, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended for a period of three years. The Hearing Panel further recommends that the suspension be made retroactive to the date of his temporary suspension. Accordingly, the Hearing Panel recommends that the Respondent be immediately reinstated to the practice of law.

"6[5]. Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

### DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the hearing panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, the discipline to be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2011 Kan. Ct. R. Annot. 334). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]). When the court assesses the existence of clear and convincing evidence, it refrains from weighing conflicting evidence, assessing witness credibility, or redetermining questions of fact. See *In re B.D.-Y.*, 286 Kan. 686, 699, 187 P.3d 594 (2008).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of both the hearing before the panel and the hearing before this court. He filed no exceptions to the panel's final hearing report. The panel's findings of fact are thus deemed admitted, and we adopt them. See Supreme Court Rule 212(c), (d) (2011 Kan. Ct. R. Annot. 352).

The evidence before the hearing panel establishes the charged misconduct of the respondent by clear and convincing evidence

and supports the panel's conclusions of law. We therefore also adopt the panel's conclusions.

The only remaining issue is the appropriate discipline to be imposed. We have held that "[t]he panel's recommendation is advisory only and shall not prevent the court from imposing a different discipline." *In re Harding*, 290 Kan. 81, 90, 223 P.3d 303 (2010); Supreme Court Rule 212(f). At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator recommended that the respondent be disbarred. The respondent requested that no discipline be imposed beyond that assessed by the military courts. As referenced above, the hearing panel recommended that respondent be suspended from the practice of law for 3 years and that the suspension be made retroactive to the date of his temporary suspension.

We begin our analysis by recognizing that in apparent support of respondent's position that the military courts have sufficiently disciplined him, he repeats an argument he made before those tribunals. Respondent essentially argues that while his actions were wrong his motive was virtuous. In short, he disclosed the information to protect the Guantanamo Bay detainees' habeas corpus rights declared in the United States Supreme Court opinion of *Rasul v. Bush*, 542 U.S. 466, 124 S. Ct. 2886, 159 L. Ed. 2d 548 (2004). During the general court-martial proceedings, that tribunal excluded respondent's motive evidence showing his purported honorable intent in disclosing the classified information. As noted by the hearing panel, the United States Navy-Marine Corps Court of Criminal Appeals affirmed, finding his motive argument "nonsensical and dangerous." *United States v. Diaz*, No. 200700970, 2009 WL 690614, at *5 (N.M. Ct. Crim. App. 2009) (unpublished opinion).

The United States Court of Appeals for the Armed Forces found that while the motive evidence might be relevant to respondent's charge of conduct unbecoming an officer, its exclusion was harmless error. It observed that supporting a harmlessness determination was respondent's knowledge that his "actions warranted concealment." *United States v. Diaz*, 69 M.J. 127, 137, 59 A.L.R. Fed.2d 701 (2010). An additional consideration supporting a harm-

lessness determination was the "absence in *Rasul* of any indication the Supreme Court intended its ruling to supersede in some manner counsel's other legal and ethical obligations," including his obligation to adhere to presidential and naval directives regarding the handling of classified information. 69 M.J. at 137.

According to the record before us, respondent was asked during his general court-martial proceedings why he chose to disclose the classified information surreptitiously. He replied, "Selfish reasons, I was more concerned with self-preservation, I didn't want to get—make any waves and jeopardize my career." When asked why he did not share with his superior officers his concerns about the Navy's then-refusal to release the information to Ms. Olshansky, Diaz replied, "I was worried about the effect it would have on me. . . . I wasn't really to put—willing to put my neck on the line and jeopardize my career at the time. . . . [So], I did it anonymously." On this latter point, the hearing panel held that "[I]f the Respondent disagreed with the actions taken by his client, the Navy, then the Respondent was duty bound to so inform those with decision making power within the Navy." The panel did not cite a KRPC provision in support of its holding. But subsection (b) of KRPC 1.13 (2011 Kan. Ct. R. Annot. 513), which sets out the rules for an attorney whose client is an organization, contains supportive language. It states:

> "If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. *Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization.* Such measures may include among others:
> (1)    asking for reconsideration of the matter;

(2)  advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3)  *referring the matter to higher authority in the organization,* including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law." (Emphasis added.) 2011 Kan. Ct. R. Annot. 513-14.

We continue our discipline analysis by referring to the ABA Standards for Imposing Lawyer Sanctions. As the hearing panel pointed out, suspension is generally appropriate when, as here, "a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." ABA Standards, Section 4.22. And as the panel further pointed out, suspension is also generally appropriate when, as here, "a lawyer in an official or governmental position knowingly fails to follow proper procedures or rules, and causes injury or potential injury to a party or to the integrity of the legal process." ABA Standards, Section 5.22. But here, we have much more.

Under ABA Standards, Section 5.11, disbarment is generally appropriate when:

"(a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft . . . .; or

"(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

Respondent's intentional actions—resulting in four felony convictions, 6 months' actual confinement, and dismissal from the naval service—undeniably qualify as serious criminal conduct under Section 5.11. And some of his criminal acts easily meet several of the specific "necessary element[s]" for disbarment, *e.g.,* theft—of his country's classified information.

As the hearing panel additionally noted in its quotation from the United States Navy-Marine Corps Court of Criminal Appeals that reviewed respondent's general court-martial, " 'One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is

superior to democratic decision making.' " *Diaz*, 2009 WL 690614, at \*5 (quoting *United States v. Cullen*, 454 F.2d 386, 392 [7th Cir. 1971]). Accordingly, respondent's reviewing court later concluded that he "negatively impacted public trust in the fidelity of our military personnel *but, more fundamentally, the appellant's conduct strikes directly at core democratic processes.*" (Emphasis added.) *Diaz*, 2009 WL 690614, at \*6. We agree.

On this general issue of harm, the hearing panel acknowledged that in determining the appropriate level of respondent's discipline, the ABA Standards call for considering as a factor "the potential or actual injury caused by the lawyer's misconduct." It correctly concluded that the respondent's misconduct "caused potential serious injury to the public." We independently observe that the particular information respondent disclosed about which detention or interrogation team was assigned to each detainee was labeled as classified. *Diaz*, 69 M.J at 133. That court concluded that if publicly disclosed, this and other information such as the detainee internment serial numbers and the source identification numbers also could "be used to the injury of the United States." 69 M.J. at 133. In addition to potential injury to the public and the United States, we also recognize the possibility of serious injury to particular persons. Simply put, the disclosure of the classified information about which team was assigned to each detainee could increase the chances of their individual members being publicly identified. Given the nature of their work, such identification could put them at personal risk by any Guantanamo Bay detainee's supporters around the world.

Based upon the number and nature of respondent's violations and criminal convictions, the conclusions of the military courts, the decision of the Judge Advocate General permanently revoking respondent's certification as a lawyer in the naval service, respondent's admitted selfish reasons for the clandestine disclosure of classified information, and the standards listed above, we conclude disbarment is the appropriate sanction. A minority of this court would impose the lesser sanction of indefinite suspension.

## Conclusion and Discipline

IT IS THEREFORE ORDERED that MATTHEW M. DIAZ be disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2011 Kan. Ct. R. Annot. 280).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2011 Kan. Ct. R. Annot. 379).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas reports.

BEIER, J., not participating.

DAVID E. BRUNS, J., assigned.